**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| SAMANTHA COX ERIGIO, | ) | NO. EDCV 12-02215 SS |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **MEMORANDUM DECISION AND ORDER** |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| Defendant. | ) | |

**I.**

**INTRODUCTION**

Samantha Cox Erigio[1] ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying her disability insurance benefits.  The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge.  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

---

[1]  Plaintiff's name before her marriage was Samantha Jean Cox.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Title II Disability Insurance Benefits on September 18, 2009. (Administrative Record ("AR") 129). Plaintiff alleged a disability onset date of July 13, 2009. (AR 143). Plaintiff's date last insured was June 30, 2011. (Id.). The Agency denied Plaintiff's application on January 12, 2010. (AR 60). Plaintiff requested reconsideration on February 1, 2010. (AR 65). The Agency denied Plaintiff's application again upon reconsideration on May 28, 2010. (AR 66). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on June 20, 2010. (AR 78). Plaintiff testified at a hearing held before ALJ Nancy Lisewski on June 22, 2011. (AR 36). On October 28, 2011, the ALJ issued a decision denying benefits. (AR 30). Plaintiff requested a review of the ALJ's decision on December 5, 2011. (AR 12). The Appeals Council denied Plaintiff's request for review on October 18, 2012. (AR 1-4). Plaintiff then filed the instant action on January 2, 2013.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on June 8, 1990.[2] (AR 129). Plaintiff last worked in July 2009 as a classified advertising representative for a magazine. (AR 40, 146). Plaintiff previously worked as a sales associate for two different retail stores; as a dresser for a fashion

---

[2] At the time Plaintiff initially filed for disability benefits, she was nineteen years old. At the time of the hearing before the ALJ, Plaintiff was twenty-one years old.

2

show company; as a contributing writer for another magazine; and as an assistant carrier for a newspaper.[3] (AR 146-159, 178-185). Plaintiff claims she stopped working "due to [her] back pain."[4] (AR 40). From January 2008 until July 2011, Plaintiff has seen multiple doctors for her back pain. (AR 246-744).

## A.   **Plaintiff's Testimony**

At her June 22, 2011 administrative hearing, Plaintiff testified that she is in constant pain every day, which keeps her from being able to work. (AR 40). Plaintiff claimed she goes to physical therapy twice a week. (Id.). She receives epidural injections in her spine once every three months for the pain. (Id.). According to Plaintiff, her pain is "on the lower left side of [her] back, and it radiates up the left side and down the left leg to the foot." (AR 41). Her pain is worse when she sits for more than thirty minutes, stands for more than ten minutes, or engages in any type of activity, such as walking. (Id.). One of the only things that makes Plaintiff feel better is

---

[3]    In the Administrative Record, there are two different work history reports with several inconsistencies. For example, one report provides that Plaintiff was an assistant carrier for a newspaper from May 2005 - September 2005, (AR 146), whereas another report provides that Plaintiff was an assistant carrier for the same newspaper from November 2004 - May 2005. (AR 178). More importantly, in one report Plaintiff stated that as a classified advertising representative for a magazine, she stood for 3 hours, sat for 5 hours, stooped for 4 hours, and lifted a maximum weight of 40 lbs, (AR 148-49), whereas in another report Plaintiff stated that she stood for 2 hours, sat for 6-8 hours, stooped for only 30 minutes, and lifted a maximum weight of 20 lbs for the same job. (AR 179).

[4]    Plaintiff's typical day now consists of watching television, going online, and going to school part-time. (AR 43).

laying down every thirty minutes, but even then she has to constantly switch positions to make the pain go away.  (AR 41, 51).

Plaintiff claimed she can lift only small things, "probably about less than five pounds or so."  (AR 45).  When Plaintiff does lift something, the pain gets worse in her back and spreads to her shoulders. (AR 45-46).  Plaintiff testified that she has hand tremors once every couple of days, and they typically last anywhere from five minutes to several hours.  (AR 47).

Plaintiff testified that she drives to physical therapy twice a week, although the driving is "difficult."  (AR 49).  The maximum time Plaintiff can drive before having to pull over and get out is about twenty minutes.  (Id.).  Plaintiff claims to have fatigue every day. (AR 42).  Plaintiff's sleep at night is "pretty terrible" because she has to get up every few hours to find a comfortable position to sleep in.  (AR 51).  Plaintiff also gets nausea a "couple times throughout the day, usually because of the pain gets [sic] to a certain where [sic] it's overwhelming."  (AR 42).

Plaintiff claimed that she takes several different medications. (AR 51).  She was prescribed Norco, which she takes "every couple of weeks."  (Id.).  She was also prescribed Ibuprofen, which she takes daily, about "one to two times a day."  (AR 51-52).  Plaintiff takes Tylenol daily.  (AR 51).  Plaintiff also takes heart medication because she was diagnosed with a heart condition.  (AR 52).

4

1    Plaintiff has had L5-S1 disc replacement surgery.   (AR 53).
2  Plaintiff experienced the same type of pain before and after the
3  surgery, but the pain is "just much worse now after surgery."   (Id.).

4

5    Plaintiff no longer works, but is attending school part-time,
6  taking one class a day, "no more than a little over an hour."   (AR 43).
7  The school accommodates her by giving her a large chair and desk, more
8  time for test-taking, and breaks every thirty minutes.   (Id.).

9

10  **B.   Vocational Expert's Testimony**

11

12    Corinne Porter, a Vocational Expert ("VE"), also testified at
13  Plaintiff's administrative hearing.   (AR 36).   The ALJ gave the VE two
14  hypotheticals and asked if any of Plaintiff's past work would be
15  available given each hypothetical.   (AR 55).   In the first hypothetical,
16  the ALJ posited an individual with the "same age, education, work
17  background, limited to light work, all posturals occasional."   (Id.).
18  The VE concluded that an individual with those limitations would be able
19  to perform Plaintiff's past work as a classified ad rep, a sales
20  associate on both occasions, a magazine writer, and a newspaper carrier.
21  (Id.).   In the second hypothetical, the ALJ posited an individual with
22  the "same age, education, work background, limited to sitting for two
23  hours, standing and walking for two hours, and would miss four or more
24  days of work per month."   (Id.).   The VE found that with those
25  additional limitations "[t]here would not be any work."   (Id.).

26

27    Plaintiff's attorney also gave the VE a hypothetical, which was a
28  variant of the ALJ's second hypothetical.   (AR 56).   Plaintiff's

attorney posited, "And in addition I'm going to be adding to that as well, which is standing and walking for two out of eight hour day, sitting limited to six out of an eight hour day, lifting 10 pounds occasionally, less than 10 pounds frequently with occasional bending and stooping, kneeling, crouching, crawling also occasional, overhead reaching at frequent, less than occasional for use of hands for manipulation, fingering and so forth, and also missing at least three days of work due to pain. Is there any past work?" (Id.).  The VE replied, "There would not be any past work" or "any other work." (Id.).

## C.   **Plaintiff's Pain Questionnaire and Function Report**

Plaintiff filled out a pain questionnaire[5] in which she claimed that her pain began in September 2007. (AR 204).  Plaintiff indicated that the pain is located in the lower left lumbar and it radiates down her left leg. (Id.).  The pain is sharp, aching, and constant. (Id.). Plaintiff takes Hydrocodone as needed. (Id.).  At the time she filled out the pain questionnaire, she had been taking Hydrocodone for seven months. (Id.).  Heating pads, baths, and laying in bed tend to relieve Plaintiff's pain. (AR 205).  Plaintiff's daily activities include watching television, reading, playing board games, and talking on the telephone. (Id.).  Plaintiff asserts she can no longer work, dance, run, lift, walk long distances, or push or pull "any weighted objects." (Id.).  According to her questionnaire, Plaintiff is able to walk only thirty feet, stand for only five minutes at a time, and sit for only

---

[5]   The pain questionnaire is not dated.

1  five minutes at a time.  (AR 206).  For errands, Plaintiff's parents and
2  fiancé drive her around.  (Id.).

3

4      Plaintiff also filled out an adult function report, dated March 26,
5  2010.  (AR 207).  Plaintiff indicated that from the time she wakes up
6  until the time she goes to bed, she showers, brushes her teeth, watches
7  television, uses the computer, reads, plays board games, and goes to
8  physical therapy.  (Id.).  Plaintiff takes care of her dogs by feeding
9  and bathing them, "with assistance."  (AR 208).  Plaintiff's fiancé
10 helps her "with everything."  (Id.).  Plaintiff's pain makes it
11 "extremely difficult to find a comfortable position" when she wants to
12 sleep.  (Id.).  Plaintiff cannot cook because it is difficult to bend or
13 stand for a "period of time."  (AR 209).  Plaintiff checked the "No" box
14 next to the question, "Do you drive?"[6]  (AR 210).  To travel, Plaintiff
15 either rides in a car or walks, but she can only walk fifteen to thirty
16 feet.  (Id.).  Plaintiff finds it difficult to focus and concentrate.
17 (AR 211).  Plaintiff goes to physical therapy and doctor appointments on
18 a regular basis.  (Id.).  Plaintiff rarely sees her friends because of
19 her "inability to be pain free."  (AR 212).  Plaintiff can lift only "2
20 pounds max."  (Id.).

21

22 **D.  Plaintiff's Mother's Third Party Function Report**

23

24     On March 26, 2010, Plaintiff's mother, Kathy Cox, filled out a
25 function report.  (AR 216).  Ms. Cox indicated that she spends ten to
26 twelve hours per day with Plaintiff.  (Id.).  Ms. Cox takes care of

27 _____
28     [6] Other evidence in the record, including Plaintiff's testimony at
   the hearing, indicates that she does, in fact, drive.  (AR 24, 49).

Plaintiff, watches television with her, and talks to her.  (Id.).  Ms. Cox also indicated that from the time Plaintiff wakes up until she goes to bed, Plaintiff watches television, showers, uses the computer, reads, plays board games, and goes to physical therapy.  (Id.).  Ms. Cox helps Plaintiff feed her dogs and bathe them.  (AR 217).  Ms. Cox claimed that Plaintiff travels by riding in a car and she cannot go out alone because she needs a wheelchair.  (AR 219).  According to Ms. Cox, Plaintiff's activities "have completely stopped since her surgery - her friends at 19 [years of age] can fully function and she can't be doing the activities normally associated with this age."  (AR 221).

**E.   Plaintiff's Medical History**

On January 24, 2008, Plaintiff had an MRI at Healthcare Imaging Center in which Dr. Allie Blackburn noted a "[m]ild disc desiccation at L5-S1," but otherwise a "normal MRI of the lumbar spine with no evidence for disc protrusion/extrusion, vertebral endplate defect, or spondylolisthesis."  (AR 247-48).  On January 25, 2008, Dr. Darren Bergey diagnosed Plaintiff with an L5-S1 disc herniation.  (AR 251).

On February 29, 2008, Plaintiff received a lumbar epidural steroid injection to help with her back pain.  (AR 253-54).  On March 10, 2008, Plaintiff received an L5-S1 discogram and an L5-S1 intradiscal injection of antibiotic.  (AR 268).  The outcome was a positive discogram at L5-S1.  (Id.).

In March 2008, Plaintiff had an L5-S1 disk replacement.  (AR 353).  The surgery yielded "good results initially."  (Id.).  After

approximately four to six months, however, Plaintiff claimed that her back pain returned and was significantly worse than before. (AR 312, 353).

On February 20, 2009, Plaintiff saw Dr. David Fish for an "initial evaluation and consultation for treatment options related to [Plaintiff's] left lower back pain and left leg pain." (AR 312). Dr. Fish recommended: (1) no new medication, (2) physical therapy, and (3) steroid injections. (AR 313-14).

On June 15, 2009, Plaintiff visited Dr. Randall Hawkins for a consultation. (AR 333). Dr. Hawkins' assessment was that Plaintiff's primary pain is due to myofascial pain syndrome. (AR 334). Dr. Hawkins recommended more physical therapy, ice rubbing, and stretching exercises. (Id.).

On July 6, 2009, Plaintiff visited the Loma Linda University Health Care facility, where Dr. John Owens examined her. (AR 360-62). Dr. Owens diagnosed Plaintiff with: (1) chronic low back pain, (2) left SI joint dysfunction, (3) degenerative disk disease with history of disk replacement, L5-S1, (4) spinal stenosis in the lumbar spine, and (5) fibromyalgia versus myofascial pain syndrome. (AR 361). Dr. Owens recommended that Plaintiff "continue with neuropsychology," continue taking Ibuprofen, and continue physical therapy. (Id.).

On July 16, 2009, Plaintiff visited Dr. Darren Bergey for a follow up from seven months before. (AR 348). Plaintiff complained of constant leg pain and left buttocks pain. (Id.). Dr. Bergey noted that

Plaintiff did not have the "transforaminal steroid or selective nerve block which [he] requested." (Id.). Dr. Bergey recommended that Plaintiff should have a left L5-S1 selective nerve block. (AR 349).

On July 21, 2009, Plaintiff visited Dr. Farbod Asgarzadie, Chief of Spinal Surgery at Loma Linda University Health Care, for a neurosurgical spine consult. (AR 353). Dr. Asgarzadie noted that Plaintiff's CT scan of the lumbar spine shows "good placement of artificial disk on CT scan with no evidence of any significant facet arthropathy on CT scan imaging." (AR 354). Dr. Asgarzadie also noted that there is no evidence of significant degeneration. (Id.). On October 13, 2009, Dr. Asgarzadie drafted a final report for his consultation with Plaintiff. (AR 409). Plaintiff had complained to Dr. Asgarzadie that she had episodes of "hemibody numbness and the feeling of subjective weakness in the legs." (Id.). Dr. Asgarzadie noted that Plaintiff's recent MRI scanning of the "whole neuro axis including brain, cervical, thoracic, and lumbar spine" did not show any significant abnormalities. (Id.). Dr. Asgarzadie concluded, "I do not think that there is any significant evidence of tethered cord or Chiari." (Id.). Dr. Asgarzadie did not recommend any surgical intervention. (Id.).

On October 16, 2009, Plaintiff saw Dr. Reza Nazemi for a neurological consultation. (AR 465). Dr. Nazemi's neurological examination revealed "a tall, attractive, pleasant, young female in no acute distress." (AR 467). Dr. Nazemi noted: "Thus far, extensive imaging of her brain and spinal column have failed to demonstrate a pathology to correlate with her symptoms, particularly her left lower extremity pain." (AR 469). On November 17, 2009, Plaintiff visited Dr.

Nazemi for a follow-up. (AR 470). Dr. Nazemi's conclusion was that "[Plaintiff] has searched the Internet and has come up with the conclusion that she has an unusual form of multiple sclerosis or some other neurological disease that nobody is able to diagnos[e]. I tried to tell her that in view of her negative neurodiagnostic workup the possibility of an organic pathology would be quite remote. . . . I strongly feel that [Plaintiff] has a very resistant underlying functional cause for her unrelenting symptoms." (AR 472).

On October 26, 2009, Plaintiff visited Dr. Gowriharan Thaiyananthan for consideration and review of her lumbar images, "to see if she has a spinal etiology of her symptoms." (AR 428-29). Dr. Thaiyananthan noted that Plaintiff's lower extremity strength reflexes were normal and she had "no perceptible focal abnormalities on exam." (AR 429). Dr. Thaiyananthan concluded that he does not believe Plaintiff has a spinal etiology for her symptoms. (Id.).

On January 26, 2010, Plaintiff visited Dr. Jeffrey Deckey at the Orthopaedic Specialty Institute for a consultation. (AR 493). Dr. Deckey noted that he would not recommend another surgery because he is "not sure exactly as to the etiology of [Plaintiff's] pain. Although she was treated for an anular tear with positive diskography, her preoperative MRI demonstrated minimal degenerative changes." (AR 495). Dr. Deckey recommended that Plaintiff have a selective S1 nerve root block on the left side to help relieve her pain. (Id.). On March 9, 2010, Plaintiff saw Dr. Deckey again for a follow up, after undergoing an L5-S1 transforaminal injection. (AR 578). Dr. Deckey noted that the transforminal injection significantly helped Plaintiff's pain and made

11

Plaintiff feel "better than she has in years.  She started physical therapy and has really turned the corner."  (Id.).  Dr. Deckey concluded, "[Plaintiff's] physical examination today demonstrates improved range of motion.  She has a normal gait.  Her motor and sensory examination is unchanged."  (Id.).

On February 19, 2010, Plaintiff visited Dr. Jerry Fralick for a consultation.  (AR 574-77).  Dr. Fralick noted that Plaintiff "appears calm and pleasant but hypervigilant."  (AR 575).  He then noted that Plaintiff appears to have "an exaggerated response to pain."  (Id.).  Dr. Fralick also noted: "[Plaintiff] has assumed a sedentary lifestyle and has not moved forward. . . . [I]n my opinion she is really not doing anything to move herself forward. . . . I think there is a psychologic component to her pain.  I told [Plaintiff] and her mother who was with her that in my opinion she has made herself more disabled than she should be."  (AR 576).  Dr. Fralick also believes that Plaintiff "should be able to perform at least sedentary duty work" and that long term disability would "be a mistake for this young individual."  (AR 577).

On March 22, 2010, Plaintiff saw Dr. Shahin Etebar again.  (AR 580).  Plaintiff was doing much better during this visit, with no new medical problems.  (Id.).  Plaintiff's main issue during this visit was "some discomfort at the lumbosacral junction and also some pain to the left of the midline at the upper lumbar area."  (Id.).  Dr. Etebar noted that Plaintiff "denies any symptoms."  (AR 581).

On May 16, 2010, Plaintiff received a complete psychiatric evaluation by Dr. Harrison.  (AR 599-604).  Dr. Harrison noted that

12

"[f]rom a psychiatric standpoint, [Plaintiff's] prognosis is expected to improve if her medical condition improves." (AR 604). Dr. Harrison also noted that "there are no mental restrictions in [Plaintiff's] daily activities." (Id.).

On April 20, 2011, Plaintiff consulted with Dr. Jean-Jacques Abitbol. (AR 639-42). Dr. Abitbol noted that "[p]ostoperative studies, including a myelogram-CT scan failed to show any evidence of neural compression and the apparatus appears in good position. Furthermore, on X-rays, there does not appear to be any loosening of the device." (AR 641). Dr. Abitbol also did not recommend surgery, "unless there [was] absolute confirmation as to the culprit causing the pain." (AR 642).

**F.   Impartial Medical Experts**

On January 12, 2010, Dr. Spellman, a State agency medical consultant, reviewed Plaintiff's medical history and opined that Plaintiff's alleged persisting severity since her alleged onset date is not evident in the exams. (AR 492).

On July 18, 2011, after the administrative hearing, Dr. Joseph Jensen, an impartial medical expert, answered a medical interrogatory pertaining to Plaintiff's medical history. (AR 742). Dr. Jensen opined that Plaintiff has the following limitations: Plaintiff can lift twenty pounds occasionally and ten pounds frequently; she can stand or walk for four hours in an eight-hour workday; she can sit for six hours in an eight-hour workday; she can occasionally climb stairs or ramps, but not ladders; she can occasionally bend, stoop, kneel, crawl, or crouch; she

can occasionally pedal with the left and she can frequently pedal with the right; she has no limitation in the use of her upper extremities for gross or fine manipulation or feeling; she can occasionally reach shoulder level; and she can frequently reach below shoulder level bilaterally. (AR 744).

## IV.
## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[7] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

---

[7]    Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. See 20 C.F.R. §§ 404.1510, 416.910.

(1) Is the claimant presently engaged in substantial
gainful activity?  If so, the claimant is found not
disabled.  If not, proceed to step two.

(2) Is the claimant's impairment severe?  If not, the
claimant is found not disabled.  If so, proceed to step
three.

(3) Does the claimant's impairment meet or equal one of the
specific impairments described in 20 C.F.R. Part 404,
Subpart P, Appendix 1?  If so, the claimant is found
disabled.  If not, proceed to step four.

(4) Is the claimant capable of performing his past work?
If so, the claimant is found not disabled.  If not,
proceed to step five.

(5) Is the claimant able to do any other work?  If not, the
claimant is found disabled.  If so, the claimant is
found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d
949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§
404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and
the Commissioner has the burden of proof at step five. Bustamante, 262
F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist
the claimant in developing the record at every step of the inquiry. Id.
at 954.  If, at step four, the claimant meets his burden of establishing
an inability to perform past work, the Commissioner must show that the
claimant can perform some other work that exists in "significant

numbers" in the national economy, taking into account the claimant's residual functional capacity[8] ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

# V.

## THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process and concluded, at step one, that Plaintiff had not engaged in substantial gainful activity between her alleged onset date of July 13, 2009 and her date last insured of June 30, 2011. (AR 21). At step two, the ALJ found that Plaintiff had severe impairments of status post L5-S1 disk replacement and fibromyalgia. Id. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 22-23).

---

[8] Residual functional capacity is "the most [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

16

At step four, the ALJ determined, based on the vocational expert's testimony, that Plaintiff could not perform any past relevant work as actually or generally performed. (AR 28-29). The ALJ did find, however, that Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a). (AR 23). Specifically, the ALJ determined that the objective clinical and diagnostic findings, treatment records, and all medical source opinions supported finding that Plaintiff "can perform at least sedentary level work duty." (AR 28). According to the ALJ, "the objective medical evidence does not support more restrictive findings than assessed herein. . . . [T]wo of the [Plaintiff's] own physicians, Dr. Fralick and Dr. Nazemi, discussed the negative findings and suggested that [Plaintiff] has a very resistant underlying functional cause for her unrelenting symptoms and she appears to have an exaggerated response to her pain." (Id.). The ALJ specifically noted that the limitations described took into consideration Plaintiff's subjective complaints, as well as the actual clinical and diagnostic findings. (Id.).

Finally, at step five, the ALJ found that through the date last insured, "considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (AR 29). Thus, the ALJ determined that Plaintiff was not disabled at any time between the alleged onset date of July 13, 2009 through the date last insured of June 30, 2011. (AR 30).

# VI.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

1

VII.

2

DISCUSSION

3

4       Plaintiff contends that the ALJ erred for two reasons.  First,
5  Plaintiff argues that the ALJ improperly assessed her credibility.
6  (Memorandum in Support of Plaintiff's Complaint ("MSPC") at 6).   To
7  support this contention, Plaintiff makes four specific arguments: (1)
8  the  ALJ  improperly  rejected  her  credibility  on  the  ground  of
9  inconsistent statements; (2) the ALJ improperly rejected her credibility
10  by an implicit finding of malingering; (3) the ALJ improperly rejected
11  her excess pain testimony on the ground that no medical opinion endorsed
12  it; and (4) the ALJ improperly rejected her excess pain testimony on the
13  ground  that  the  pain  she  described  was  out  of  proportion  to  the
14  objective medical evidence.  (MSPC at 6-19).  Second, Plaintiff argues
15  that  the  ALJ  improperly  considered  the  medical  opinion  evidence
16  regarding her functional limitations by concluding that she was not
17  disabled at any time during the relevant period.  (MSPC at 19-21).  The
18  Court disagrees. For the reasons discussed below, the ALJ's decision
19  must be AFFIRMED.

20

21  **A.   The ALJ Properly Assessed Plaintiff's Credibility**

22

23      The ALJ is responsible for determining a claimant's credibility.
24  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009)(quoting Andrews v.
25  Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).   To determine whether a
26  claimant's testimony regarding her subjective pain or symptoms is
27  credible, the ALJ must engage in a two-part analysis.  Molina v. Astrue,
28  674 F.3d 1104, 1112 (9th Cir. 2012)(citing Vasquez, 572 F.3d at 591).

First, the ALJ must determine whether the claimant has presented objective medical evidence of an impairment that could reasonably be expected to produce the pain or symptoms alleged. Id.  The claimant does not have to show that her impairment "'could reasonably be expected to cause the severity of the symptom[s] she has alleged; she need only show that it could reasonably have caused some degree of the symptom[s].'"  Vasquez, 572 F.3d at 591 (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007))(emphasis added).  Therefore, the ALJ cannot reject a claimant's subjective pain testimony "'simply because there is no showing that the impairment can reasonably produce the degree of the symptom alleged.'"  Lingenfelter, 504 F.3d at 1036. (quoting Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)).

Second, if the claimant satisfies the first part of the analysis, and if there is no affirmative evidence of malingering, "'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Molina, 674 F.3d at 1112 (quoting Vasquez, 572 F.3d at 591).  If the ALJ wants to discredit a claimant's testimony because the complaints are inconsistent with clinical observations, the ALJ can satisfy the clear and convincing threshold by specifying what complaints are contradicted by what clinical observations.  Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1297-99 (9th Cir. 1999)).  Moreover, the ALJ must consider the objective medical evidence, together with other evidence, when evaluating a claimant's complaints about her pain and symptoms. See 20 C.F.R. § 404.1529(c)(2)("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we

1   will not reject your statements about the intensity and persistence of
2   your pain or other symptoms or about the effect your symptoms have on
3   your ability to work solely because the available objective medical
4   evidence does not substantiate your statements."); see also Light v.
5   Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ
6   may not discredit a claimant's subjective pain testimony solely on the
7   ground that no objective medical evidence supports it).  "Instead, the
8   ALJ must discredit the claimant's subjective testimony by finding that
9   she is not credible." Rollins v. Massanari, 261 F.3d 853, 859 (9th Cir.
10  2001).

11

12      The ALJ may consider many factors when evaluating a claimant's
13  credibility, including "'(1) ordinary techniques of credibility
14  evaluation, such as the claimant's reputation for lying, prior
15  inconsistent statements concerning the symptoms, and other testimony by
16  the claimant that appears less than candid; (2) unexplained or
17  inadequately explained failure to seek treatment or to follow a
18  prescribed course of treatment; and (3) the claimant's daily
19  activities.'" Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)
20  (quoting Smolen, 80 F.3d at 1284); see also Light, 119 F.3d at 792
21  (holding that in order to find a claimant not credible, "the ALJ must
22  rely either on reasons unrelated to the subjective testimony (e.g.,
23  reputation for dishonesty), on conflicts between his testimony and his
24  own conduct, or on internal contradictions in that testimony.").  If the
25  ALJ's credibility finding is supported by substantial evidence in the
26  record, "the Court may not engage in second-guessing." Thomas v.
27  Barnhart, 278 F.3d 947, 959 (9th Cir. 2002); see also Rollins, F.3d at
28  857 (where the ALJ's interpretation of the plaintiff's testimony may not

1    have been the only reasonable one, but was still a reasonable
2    interpretation supported by substantial evidence; it was not the court's
3    role to second-guess it).

4

5        Here, the ALJ provided clear and convincing reasons for rejecting
6    Plaintiff's excess pain testimony and for finding Plaintiff's
7    allegations about her symptoms and limitations not fully credible.
8    Under the first part of the analysis, the ALJ considered Plaintiff's
9    testimony, the pain questionnaire and function report that Plaintiff
10   completed, and the objective medical evidence, and properly held that
11   Plaintiff's medically determinable impairments "could reasonably be
12   expected to cause the alleged symptoms." (AR 24-25); see Vasquez, 572
13   F.3d at 591 (Plaintiff "'need not show that her impairment could
14   reasonably be expected to cause the severity of the symptom[s] she has
15   alleged; she need only show that it could reasonably have caused some
16   degree of the symptom[s].'")(quoting Lingenfelter, 504 F.3d at 1036).

17

18       Plaintiff did have an L5-S1 disk replacement surgery in March 2008.
19   (AR 353). More than a year later, on July 6, 2009, Dr. Owens diagnosed
20   Plaintiff with chronic low back pain, degenerative disk disease with
21   history of disk replacement at L5-S1, and fibromyalgia versus myofascial
22   pain syndrome. (AR 361). In a pain questionnaire, Plaintiff indicated
23   that she is experiencing pain located in the lower left lumbar and the
24   pain radiates down her left leg. (AR 204). Plaintiff also indicated in
25   both the pain questionnaire and a function report that she can no longer
26   walk long distances or lift heavy objects. (AR 204-14). In light of
27   this evidence, Plaintiff's medically determinable impairments could

28

reasonably be expected to cause her alleged symptoms and reports of pain. Thus, Plaintiff satisfied the first part of the analysis.

**1.   The ALJ Properly Rejected Plaintiff's Credibility On The Ground Of Inconsistent Statements**

Under the second part of the analysis, the ALJ properly concluded that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not fully credible. (AR 25). In making this determination, the ALJ considered Plaintiff's testimony, the pain questionnaire and function report that Plaintiff completed, and the objective medical evidence, which included reports by multiple doctors with whom Plaintiff consulted. (AR 24-28).

The ALJ gave specific examples in the record to support her finding that Plaintiff was not fully credible. For example, the ALJ noted inconsistencies in the record where Plaintiff "indicated in her function report that she does not drive, but she testified [at the hearing that] she is able to drive for twenty minutes at a time." (AR 24). The ALJ also noted that at the hearing, Plaintiff "[testified] she could lift up to five pounds, but in her function report, she said she cannot lift more than two pounds." (Id.). The ALJ acknowledged that Plaintiff might not intend to mislead, but "nevertheless the inconsistencies suggest that the information provided by [Plaintiff] generally may not be entirely reliable."[9] (Id.). Plaintiff's inability to accurately

---

[9] A closer look at the record reveals that Plaintiff's work history reports also contain inconsistencies. For example, Plaintiff provided inconsistent statements regarding her job as a classified advertising

describe her prior physical abilities and limitations shows that she may
be providing inaccurate information about her current functional
limitations.   The ALJ's finding of these inconsistencies in the record
certainly falls within the realm of "ordinary techniques of credibility
evaluation."  Tommasetti, 533 F.3d at 1039 (citing Smolen, 80 F.3d at
1284); see also Light, 119 F.3d at 792 (holding that the ALJ can rely on
internal contradictions in a Plaintiff's testimony when assessing her
credibility).   Moreover, the ALJ's findings satisfy the requirement
that the ALJ offer specific, clear and convincing reasons for rejecting
Plaintiff's testimony about the severity of her symptoms.  See Molina,
674 F.3d at 1112 (citing Vasquez, 572 F.3d at 591).

    The ALJ also properly discredited Plaintiff's testimony and
satisfied the "clear and convincing" threshold by identifying specific
complaints by Plaintiff that were contradicted by objective medical
evidence.  Regennitter, 166 F.3d at 1297-99.   For example, the ALJ
noted that Plaintiff had a neurological examination on October 16, 2009
with Dr. Nazemi, where Plaintiff complained of "numbness of the right
hand, loss of dexterity of her hand, numbness of the last 2 toes of the
right foot, [and] neck, shoulder, and low back pain," but the
neurological examination by Dr. Nazemi yielded results that were
"essentially normal."  (AR 26); see Regennitter, 166 F.3d at 1297
(holding that the ALJ can satisfy the clear and convincing threshold by
specifying "what complaints are contradicted by what clinical

representative for a magazine, contending in one report that she lifted
a maximum weight of forty pounds, while contending in another report
that she lifted a maximum weight of only twenty pounds.  (AR 148-49,
179).

observations"). Another example the ALJ noted was a January 26, 2010 consultation with Dr. Deckey, where Plaintiff "continued her complaints of pain," but again, "her physical exam revealed subjective tenderness with limitation in range of motion, but her motor and sensory examination was grossly within normal limits, an x-ray demonstrated a well positioned disk replacement at L5-S1, and her CT myelogram demonstrated no significant facet arthrosis." (AR 27). The ALJ properly considered the inconsistencies between Plaintiff's reports of pain and her doctor's observations when she deemed Plaintiff not fully credible.

### 2. The ALJ Properly Rejected Plaintiff's Credibility, But Not By An Implicit Finding Of Malingering

Plaintiff contends that the ALJ erred because she improperly rejected Plaintiff's credibility by an implicit finding of malingering. (MSPC 15). To support her argument, Plaintiff points to the ALJ's reasoning, where she stated, "Moreover, two of the claimant's own physicians have questioned her pain response, one even noting an exaggeration of pain." (AR 24). The ALJ did not implicitly find malingering here, but rather considered the Plaintiff's pain allegations in light of the objective medical evidence and found that Plaintiff's excess pain testimony should be rejected because no medical opinion endorsed it and it was out of proportion to the objective medical evidence.

When a claimant satisfies the first part of the analysis, which Plaintiff did, and if there is no affirmative evidence of malingering,

"'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Molina, 674 F.3d at 1112 (quoting Vasquez, 572 F.3d at 591). Specifically, "the ALJ must discredit the claimant's subjective testimony by finding that she is not credible." Rollins, 261 F.3d at 859. The ALJ can consider many factors when evaluating a claimant's credibility, such as claimant's prior inconsistent statements concerning her symptoms. Tommasetti, 533 F.3d at 1039.

As already discussed in detail above, because there was no affirmative evidence of malingering in the record, the ALJ had to assess Plaintiff's credibility and then consider Plaintiff's pain allegations in light of the objective medical evidence. See Rollins, 261 F.3d at 859. This is precisely what the ALJ did. The ALJ properly rejected Plaintiff's credibility, by finding her own statements to be inconsistent and by finding Plaintiff's testimony to be contradicted by the objective medical evidence.

### 3.   The ALJ Properly Rejected Plaintiff's Excess Pain Testimony On The Ground That No Medical Opinion Endorsed It

Generally, an ALJ cannot reject a claimant's subjective pain testimony solely on the ground that no objective medical evidence supports it. Light, 119 F.3d at 792. An ALJ can, however, discredit a claimant's subjective pain testimony by finding claimant not credible. Rollins, 261 F.3d at 859. Furthermore, an ALJ "'can reject the claimant's testimony about the severity of her symptoms only by offering

1  specific, clear and convincing reasons for doing so.'" <u>Molina</u>, 674 F.3d
2  at 1112 (quoting <u>Vasquez</u>, 572 F.3d at 591).

3

4      Here, the ALJ properly discredited Plaintiff's subjective pain
5  testimony by finding her not fully credible, as discussed above.   The
6  ALJ then considered the objective medical evidence and compared it to
7  Plaintiff's subjective pain testimony, which was given very little
8  weight in light of the ALJ's credibility findings.   Thus, the ALJ did
9  not reject Plaintiff's subjective pain testimony solely on the ground
10 that no objective medical evidence supported it.   The ALJ first
11 determined that Plaintiff was not fully credible because of Plaintiff's
12 inconsistent statements, as discussed above.   She then considered
13 Plaintiff's subjective pain testimony in light of the objective medical
14 evidence and provided specific, clear and convincing reasons for
15 rejecting Plaintiff's excess pain testimony.

16

17     The ALJ noted the findings of several doctors whom Plaintiff
18 consulted with, and found that Plaintiff's allegations of symptoms and
19 pain are "greater than expected in light of the objective evidence . .
20 . ." (AR 25-26).  Dr. Asgarzadie noted that Plaintiff's imaging results
21 "show good placement of artificial disk with no evidence of any
22 significant facet arthropathy and no evidence of any significant
23 degeneration." (AR 354).  Dr. Jensen noted that Plaintiff can lift
24 twenty pounds occasionally and ten pounds frequently, (AR 744), whereas
25 Plaintiff alleges she can only lift "2 pounds max." (AR 212).  The ALJ
26 assessed Plaintiff's complaints and each medical report separately and
27 as a whole, she gave more weight to treating physicians, and ultimately
28 held that Plaintiff's excess pain testimony had to be rejected.

**4.   The ALJ Properly Rejected Plaintiff's Excess Pain Testimony On The Ground That The Pain She Described Was Out Of Proportion To The Objective Medical Evidence**

Plaintiff argues that the ALJ's ground, i.e., that the pain Plaintiff described was out of proportion to the objective medical evidence, was improper.  For the same reasons  stated above, the ALJ properly rejected Plaintiff's excess pain testimony.  The ALJ properly discredited Plaintiff's subjective pain testimony by finding her not credible because of inconsistent statements, as discussed above.  The ALJ then considered Plaintiff's subjective pain testimony in light of the objective medical evidence and found that Plaintiff's allegations of symptoms and pain are "greater than expected in light of the objective [medical] evidence . . . ." (AR 25-26).  Moreover, the ALJ provided specific, clear and convincing reasons for rejecting Plaintiff's pain testimony, also discussed above.  See Molina, 674 F.3d at 1112 (citing Vasquez, 572 F.3d at 591).  Thus, the ALJ properly rejected Plaintiff's excess pain testimony on the ground that the pain described was disproportionate to the objective medical evidence.

**B.   The ALJ Properly Considered The Medical Opinion Evidence Regarding Plaintiff's Functional Limitations When She Concluded That Plaintiff Was Not Disabled At Any Time Between Her Alleged Onset Date And Her Date Last Insured**

Plaintiff finally argues that the ALJ failed to properly consider the medical opinion evidence regarding Plaintiff's functional limitations by concluding that Plaintiff was not disabled at any time

28

during the relevant period.  Upon examining the Administrative Record, the ALJ found that there was no medical source in the record "from an examining or treating physician that endorses the extent of [Plaintiff's] alleged functional limitations." (AR 25).  When an ALJ is considering objective medical evidence, she must give controlling weight to a treating physician's opinion if it is "well-supported and not inconsistent with the other substantial evidence in the record." Lingenfelter, 504 F.3d at 1038; see also 20 C.F.R. § 404.1527.  Here, in reaching her conclusions about Plaintiff's functional limitations, the ALJ properly gave great weight to the treating physicians' opinions.

The ALJ discussed in depth the weight she gave to several of the doctors Plaintiff consulted with.  For example, the ALJ gave "great weight to the opinion of [Plaintiff's] pain management physician, Dr. Jerry Fralick." (AR 28).  This is appropriate because Dr. Fralick appeared to be one of Plaintiff's treating physicians.  See Lingenfelter, 504 F.3d at 1038.  Dr. Fralick observed and examined Plaintiff and opined that Plaintiff should be able to perform "at least sedentary duty work." (AR 28).  In fact, Dr. Fralick opined that Plaintiff appears to have an exaggerated response to pain, is really not "doing anything to move herself forward," and has "made herself more disabled than she should be." (AR 575-76).  The ALJ also gave great weight to Dr. Nazemi, who was another of Plaintiff's treating physicians. (AR 28).  Dr. Nazemi opined that there is no pathology to correlate with Plaintiff's symptoms and Plaintiff "has a very resistant underlying functional cause for her unrelenting symptoms." (AR 469-72). The ALJ properly gave these doctors great weight in considering their medical reports to determine Plaintiff's functional limitations because

they were both Plaintiff's treating physicians, they worked closely with the Plaintiff, and their opinions were "well-supported and not inconsistent with the other substantial evidence in the record." Lingenfelter, 504 F.3d at 1038.

The ALJ also considered medical reports by impartial medical experts. For example, the ALJ gave "some, but not significant, weight to the opinion of Dr. Jensen." Dr. Jensen opined that Plaintiff could, among other things, stand or walk for four hours in an eight-hour workday and sit for six hours in an eight-hour workday. (AR 744). The ALJ, however, adopted a more "restrictive residual functional capacity" for Plaintiff than Dr. Jensen did. (AR 27).

Lastly, the ALJ gave little weight to the State agency medical consultant after reconsideration, Dr. Spellman, because although the consultant affirmed the residual functional capacity during initial review, he later opined that Plaintiff "could perform light level work duty." Because of the medical consultant's inconsistent opinions (i.e. initially affirming that Plaintiff could do sedentary level work, but later stating that Plaintiff could perform light level work duty), the ALJ properly gave him less weight. (AR 28).

The ALJ considered the objective medical evidence as a whole and held that Plaintiff could perform "at least sedentary level work," a finding consistent with several treating doctors as well as State Agency medical consultants. (AR 28). No remand is required.

**VIII.**

**CONCLUSION**


Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner.  The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.


DATED: October 10, 2013



_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE


**THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER ONLINE DATABASE.**